Revised August 25, 2000

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-41103

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE RAMON VEGA; REINALDO
SANCHEZ IZQUIERDO,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

August 8, 2000

Before POLITZ, SMITH, and DENNIS, Circuit Judges.

POLITZ, Circuit Judge:

Jose Ramon Vega, Reinaldo Sanchez Izquierdo, and Juan Companion were charged with conspiracy to possess with intent to distribute marihuana and possession with intent to distribute marihuana in violation of 21 U.S.C. § § 846 and 841(a)(1) after the police found marihuana in a house rented by Izquierdo and

another home rented by Companion.  Companion entered a guilty plea.  Vega and Izquierdo's motion to suppress evidence of the drugs obtained at the residences was denied.   A jury found Vega and Izquierdo guilty as charged and they appeal the denial of their motion to suppress and advance several claimed trial errors.

## BACKGROUND

On January 7, 1998, Officer Rolando Vasquez of the Brownsville Police Department received a telephone call from agents of the Federal Bureau of Investigation advising that an informant had provided information that three individuals would be driving through Brownsville in a dark sedan with Florida license plates, carrying a large amount of cash intended for the purchase of narcotics.  The informant cautioned that the men were armed, noting that the three individuals were Cuban and that one had a darker complexion than the others.

The police located an empty sedan fitting the description in a city parking lot in downtown Brownsville and Vasquez put it under surveillance.  Shortly thereafter Vega and Izquierdo approached the vehicle but walked around the downtown area for a while before returning and driving away.  Vasquez followed the sedan to a residence at 1744 Taft Street.  The two men entered same, exiting ten minutes later, stopping briefly at a pay phone, and then proceeding to a residence at 2994 Elena Street.  While the police were monitoring the Elena Street residence, a third person, Companion, exited to use a pay telephone across the street and then returned to the house.  At this point, none of the officers had seen any signs that these as yet unknown men possessed any drugs, money, or weapons.

2

The police had neither a search warrant nor probable cause but determined to go to the house and request the owner's consent to enter to search for weapons and narcotics. Vasquez and eight colleagues surrounded the house. Three of the officers went to the front door, one dressed in uniform, the other two wearing bullet proof vests clearly marked "POLICE." One of the officers saw someone inside move quickly to the back of the house. He began to knock, simultaneously calling out "Brownsville police." Vega, obviously aware of the officers' presence, exited the house through its back door and was arrested as he attempted to go into a nearby alley. Vasquez climbed the perimeter fence into the backyard and, hearing "movement" inside the house, he said that he decided to enter same through the door left open by Vega in order to protect the safety of his fellow officers.

Once inside the house, Vasquez said he found Izquierdo and Companion attempting to hide, and he smelled marihuana. He forced Izquierdo and Companion to a position on the floor near the doorway and advised them of their **Miranda** rights. The two men, when asked, denied that they lived at the residence and claimed instead that the house belonged to Vega. The house was, in fact, under lease to Izquierdo at that time. Vasquez went to the patrol car where Vega was being detained and asked whether he lived at the house. Vega said he did and, when asked for consent to search the residence, he reportedly responded "go ahead."

During the search the police found four buckets of marihuana. They also found a lease agreement reflecting that Companion was the lessee of the Taft Street residence. While still in custody, Companion consented to a search of that

residence. In an attempt to expiate himself, Izquierdo began giving the police incriminating information. He told them that there were drugs at the Elena Street residence and that he, Vega, and Companion recently had mailed several boxes of marihuana. The police then returned to the Taft Street residence with Izquierdo and Companion. While waiting for delivery of the keys to the house, which had been in Vega's possession, both Companion and Izquierdo told the police about more marihuana to be found in the house. The police eventually entered the residence, found, and seized the marihuana.

Vega, Izquierdo, and Companion were indicted in one count of conspiracy to possess with intent to distribute in excess of 50 kilograms of marihuana, and three counts of possession with intent to distribute less than 50 kilograms of marihuana. Vega and Izquierdo filed motions to suppress the evidence seized at the time of their arrest and their subsequent statements to the police. After a hearing the district court denied both motions. No reasons were assigned.

Companion entered a guilty plea. A jury found Vega and Izquierdo guilty on all counts. The district court sentenced Vega to 27 months imprisonment to be followed by three years supervised release; Izquierdo was sentenced to 210 months imprisonment and three years supervised release. Vega and Izquierdo timely appealed.

## ANALYSIS

Vega and Izquierdo contend that the district court erred in denying their

4

motion to suppress evidence discovered during the search of the Elena Street residence. The government maintains that the actions of the Brownsville police did not violate the fourth amendment rights of either Izquierdo or Vega. It first contends that neither defendant's interest in the home was sufficient to give rise to fourth amendment protections. It then asserts that the search was lawful despite the absence of a warrant because exigent circumstances necessitated an immediate entry. Finally, the government contends that Vega consented to the search of the residence.

In reviewing the denial of a motion to suppress evidence under the fourth amendment, we "review the district court's factual findings for clear error and its conclusions regarding the constitutionality of a warrantless search *de novo*. Further, the voluntariness of consent to a warrantless search is a finding of fact reviewed for clear error."[1] The finding of exigent circumstances is one of fact.[2] The clear error standard in this instance must be relaxed because the record contains no findings of fact.[3] As there are virtually no contested facts, however, our review herein is essentially *de novo*.

The government insists that neither Izquierdo nor Vega has "standing" to contest the search of the Elena street residence. Whether couched as an issue of

---

[1]**United States v. Morales**, 171 F.3d 978, 981 (5th Cir. 1999) (citation omitted).

[2]**United States v. Richard**, 994 F.2d 244 (5th Cir. 1993).

[3]**Lopez v. Texas Econ. Dev. Comm'n**, 807 F.2d 430 (5th Cir. 1987) ("The correct application of the clearly erroneous standard of review requires that an appellate court be able to discern the evidentiary basis for the trial court's factual finding.")

standing or the existence of a protected interest,[4] the gravamen of the government's position is that neither appellant enjoyed a subjective expectation of privacy in the premises that society is prepared to recognize as reasonable and, therefore, the government's intrusion was not a "search."[5]  The defendants bear the burden of establishing such an expectation by a preponderance of the evidence.[6]

**Izquierdo's Fourth Amendment Interest in the Residence**

As lessee of the residence, Izquierdo's expectation of privacy was reasonable inasmuch as it had "a source outside of the Fourth Amendment ... by reference to [both] concepts of real property ... law" and "understandings that are recognized and permitted by society."[7] As we explained in **Ibarra**, the following factors are considered in the determination whether an interest is protected by the fourth amendment:

whether the defendant has a possessory interest in the thing seized or the

---

[4]As the Supreme Court explained in **Minnesota v. Carter**, 525 U.S. 83, 88 (1998),

"the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."[**Rakas v. Illinois**,] 439 U.S. at 140, 99 S.Ct. 421. Thus, we held that in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.

[5]**Katz v. United States**, 389 U.S. 347 (1967).

[6]**United States v. Cardozo-Hinojosa**, 140 F.3d 610 (5th Cir. 1998), quoting **United States v. Ibarra**, 948 F.2d 903, 905 (5th Cir. 1991) ("To establish a Fourth Amendment violation, [the proponent of a motion to suppress] must show that [he] had a legitimate expectation of privacy in the area searched." **Id.** at 905.).

[7]**Rakas v. Illinois,** 439 U.S. 128, 143 n. 12 (1978).

place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises.[8]

In **Cardozo-Hinojosa**, we recognized that fourth amendment protections are "presumptively applicable"[9] to premises owned or used by an individual.[10] Izquierdo's possessory interest in the house therefore creates a strong presumption of his subjective and reasonable expectation of privacy therein. Clearly Izquierdo, as lessee, had the right to exclude others and was legitimately on the premises. The condition of the house itself exhibited measures in excess of "normal precautions to maintain privacy" and further manifested Izquierdo's subjective expectation of

---

[8]**Ibarra,** 948 F.2d at 906. See also, **Rakas,** 439 U.S. at 149 (legitimate expectation of privacy turns in large part on ability to exclude others from the place searched).

[9]**Cardozo-Hinojosa**, 140 F.3d at 613.

[10]**Id.** Cardoza-Hinojosa describes the principles applicable to this case, but is clearly distinguishable. In that case, we concluded that Cardoza-Hinojosa failed to satisfy several of the **Ibarra** factors. He had the right to use the shed, but he did not establish that he had the right to exclude others. His lack of a subjective expectation of privacy was evident from the fact that he"[agreed] to do the deal in his shop," **id.** at 616, and that when he witnessed an undercover officer, Olivo, leaving the shed he did not react as though Olivo had breached his expectation of privacy. Finally, he took actions that were inconsistent with "normal precautions to maintain privacy." He had invited strangers to a meeting in the immediate vicinity of the shed, which he knew to be unlocked. Even knowing this, Cardoza-Hinojosa was not present at the designated meeting time to assure that no one wandered into the shed.

In the case at bar Izquierdo had a right to exclude others from the house by virtue of his leasehold interest. In addition, his conduct did not evidence the lack of a subjective expectation of privacy. He did not nonchalantly acquiesce in the officers' presence in the home. Nor did he invite the officers or any other stranger in or anywhere near the house. Finally, he did not fail to take "normal precautions to maintain privacy" by inviting strangers to meet near the house and then fail to protect his privacy from them. We reject the government's other assertions of his failure to take such precautions, infra.

privacy. The entire curtilage of the house was enclosed within a fence. The front porch had a thigh-high iron railing preventing access except through a gate. All windows were covered by iron bars.

The government submits that several actions by Izquierdo and his co-defendants evidence a failure by Izquierdo to take "normal precautions to maintain privacy" in the house. No suggestion is persuasive. Stripped to essentials, the government first suggests that when Vega ran out of the house, Izquierdo's constitutional rights followed. The government contends that the door left open by Vega "expose[d] [the interior of the house] to public view" and that therefore the house "is not a subject of Fourth Amendment protection."[11] We reject as untenable the proposition that because one exiting the house left a side door open that Izquierdo's expectation of privacy was in some way diminished.[12] Next, the government contends that a "normal precaution" required of one who desires to maintain his privacy is to attempt to prevent raiding government agents from entering the premises. The government faults Izquierdo for not questioning the officers' reason for knocking on the door and for not offering evidence of his interest in the dwelling. To our knowledge, no court has required such an

---

[11]**Katz**, 389 U.S. at 351.

[12]**Bryant v. United States**, 599 A.2d 1107, 1110 (D.C. 1991) ("Appellant testified that sometimes the front door was left open--as on this late June occasion--and at other times it was locked. We cannot infer merely from this that the tenants took no 'reasonable precautions in attempting to maintain privacy.'"); **State v. Sakellson**, 379 N.W.2d 779, 782 (N.D.1985)("Whether a door is open through simple inadvertence or design, it should not subject an occupant to the unannounced entry of the uninvited. Simply because one forgot, or purposefully failed to close a door, does not create a reasonable expectation of an uninvited, unannounced entry.").

8

affirmative assertion of fourth amendment rights in order to preserve them, and we decidedly decline to do so now.

In addition, the government contends that Izquierdo essentially waived his fourth amendment protection in the home by denying that he resided there. The government has not suggested that Izquierdo abandoned the premises. We do not agree that Izquierdo's fourth amendment rights evaporated simply because he failed to make incriminating admissions in response to police questioning.[13] One does not lose the legitimate expectation of privacy in a residence merely by denying an interest therein. Indeed, "a misleading response to an officer's question is a far cry from consent to search."[14]

Nor did Izquierdo forfeit his fourth amendment protection by using the premises for illegal activities. In advancing this argument, the government quotes the following passage in **Rakas v. Illinois**:

> a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence ... is "wrongful"; his expectation is not "one that society is prepared to recognize as reasonable."[15]

The government clearly misinterprets this passage. In the example, the burglar's expectation of privacy loses its legitimacy not because of the wrongfulness of his

---

[13]**Commonwealth v. Sandler**, 335 N.E.2d 903 (Mass. 1975); **United States v. Brown**, 64 F.3d 1083 (7th Cir. 1995).

[14]**Brown**, 64 F.3d 1083.

[15]**Rakas**, 439 U.S. at 143 n. 12.

activity, but because of the wrongfulness of his presence in the place where he purports to have an expectation of privacy. Indeed, the **Rakas** Court went on to explain that "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [his] right to exclude ... ."[16] Regardless of the activity conducted by Izquierdo at the residence, there is no question that he "lawfully possess[ed] or controll[ed the] property." As Justice Ginsberg forcefully has noted, "[i]f the illegality of the activity made constitutional an otherwise unconstitutional search, such Fourth Amendment protection, reserved for the innocent only, would have little force in regulating police behavior toward either the innocent or the guilty."[17]

In short, these arguments demonstrate a fundamental misunderstanding of the requirement that one take "normal precautions to maintain privacy." That simply means that a defendant must outwardly behave as a typical occupant of the space in which he claims an interest, avoiding anything that might publicly undermine his expectation of privacy. The record reflects that Izquierdo did this. He therefore had a reasonable expectation of privacy in the house he leased at 2994 Elena Street, an expectation which was protected by the fourth amendment. Any ruling to the

---

[16]**Id.**

[17]**Minnesota v. Carter,** 525 U.S. at 110 (Ginsburg, J., dissenting); **United States v. Fields**, 113 F.3d 313, 321 (2nd Cir. 1997) (observing that "many Fourth Amendment issues arise precisely because the defendants were engaged in illegal activities on the premises for which they claim privacy interests").

contrary constitutes clear error.[18]

## Vega's Fourth Amendment Interest in the Residence

Fourth amendment rights are individually held and cannot be asserted solely by reference to a particular place.[19] Therefore, Vega must demonstrate that he had an individual subjective and legitimate expectation of privacy in the Elena Street residence in order to establish that his fourth amendment rights were violated. Such an interest can, however, be established in the residence of another.[20] We will recognize and protect an expectation of privacy in the home of another when it is based on a visit which represents "a longstanding social custom that serves functions recognized as valuable by society." In **Olson**, that custom was staying overnight in the home of another.

Indeed, the Supreme Court recognized in **Carter** that the overnight guest "typif[ies] those who may claim the protection of the Fourth Amendment in the home of another."[21] At the other end of the spectrum, one merely "legitimately on the premises" represents the typical individual who may not claim such protection.

---

[18]**Minnesota v. Carter** does not, as the government suggests, impact our analysis here. Therein, the Supreme Court addressed only the expectation of privacy held by one who makes a visit to the home of another solely for a business purpose. That case did not consider the fourth amendment interests of lessees, and therefore is not relevant on the issue of Izquierdo's rights.

[19]**Katz v. United States**, 389 U.S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places").

[20]**Minnesota v. Olson**, 495 U.S. 91 (1990).

[21]**Carter**, 525 U.S. at 91.

In **Carter**, the Court considered the position along that spectrum of two defendants who were in the apartment of another solely for the purpose of bagging cocaine. The court concluded that the visit was primarily commercial and not social, noting the lack of a prior relationship between the defendants and the lessee of the apartment, the brevity of the visit, and the fact that, as to the defendants, the apartment was "simply a place to do business."[22]

We similarly conclude that Vega lacks a basis to challenge the search. He presented no evidence at the suppression hearing tending to show that his visit to the Elena Street residence was anything other than commercial in nature. Indeed, he offered no evidence of his purpose for being there. Nor did he show that he had ever been to the residence before the day of the raid or that he had any sort of relationship with Izquierdo prior to that day. Simply stated, Vega has failed to meet his burden of showing that he had a legitimate expectation of privacy in the residence at 2994 Elena Street.

**Constitutionality of the Search**

Having established that Izquierdo had a fourth amendment interest in the Elena Street residence, we next consider whether that interest was violated by the actions of the Brownsville police. The fourth amendment requires that

> the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches or seizures, shall not be violated, and no warrant shall issue but upon probable cause, supported by Oath or

---

[22]**Id.** at 90.

affirmation, and particularly describing the place to be searched and the persons or things to be seized.

A warrantless search is *per se* unreasonable unless the government can demonstrate that it falls within one of a carefully defined set of exceptions to the fourth amendment's warrant requirement.[23]   The government advances two such exceptions herein: that the officers' actions were in response to exigent circumstances and that Vega's consent sanitized the subsequently obtained evidence.


*Exigent Circumstances*

The government insists that at the moment Officer Vasquez decided to enter the house there existed the danger that the occupants of the house might dispose of any illegal substances therein, and that they might attempt to barricade themselves in the house or open fire on the officers.  Warrantless searches are not unreasonable under the fourth amendment if supported by probable cause and exigent circumstances.[24]   The asserted exigencies, however, may not consist of the likely consequences of the government's own actions or inaction.[25]

As for probable cause, Officer Vasquez conceded during the suppression hearing that the officers did not have probable cause to search the residence as they

---

[23]**United States v. Munoz-Guerra**, 788 F.2d 295 (1986), citing **Coolidge v. New Hampshire**, 403 U.S. 443 (1971).

[24]**Steagald v. United States**, 451 U.S. 204 (1981); **United States v. Rico**, 51 F.3d 495 (5th Cir. 1995).

[25]**United States v. Thompson**, 700 F.2d 944 (5th Cir. 1983).

13

approached it. The real question, then, is whether Vega's flight from the house, when considered in combination with the other information then available to the police, was sufficient to establish probable cause prior to the actual intrusion.[26] We opt not to consider this issue. Instead, we dispose of this argument based on the government's failure to establish the existence of exigent circumstances not of its own making.

Our decision today is in large part guided by our decision in **Munoz-Guerra**, wherein an anonymous tipster informed the police that a large quantity of marihuana was being stored in an otherwise empty condominium. The caller also stated that the occupant had firearms and that she had seen some white powder and a large amount of money in the condominium. Two police officers corroborated substantial portions of the tipster's account and called for assistance from the federal Drug Enforcement Agency. One of the DEA agents observed a marihuana cigarette on the sill of a ground floor window and a bag of white powder on the floor inside. He and another agent climbed a fence that enclosed a small patio on the side of the condominium and knocked on the patio door. When Munoz-Guerra

---

[26]The Supreme Court recently decided in **Illinois v. Wardlow**, __ U.S. __, 120 S.Ct. 673 (2000), that a person in a high crime area who flees at the sight of police officers may create a reasonable suspicion sufficient to warrant a **Terry** stop. The Court said it is permissible for the courts and police to draw an inference of wrongdoing from the fact of "unprovoked" flight. **Id.** at 676 ("Headlong flight - wherever it occurs - is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). While the fact that Vega dashed out of the house, by itself, clearly is not enough to create probable cause for his arrest, let alone probable cause to search the house, it is among the relevant contextual considerations in the probable cause analysis. The weight to be given such an inference and its effect as a factor in the probable cause equation generates cause for pause, however, **Id.** at 680 (Stevens, J., concurring in part, dissenting in part), and is not a task we choose to undertake based on the scant attention the issue received during the suppression hearing and briefs filed herein.

14

responded, the agents ordered him to place his hands on the glass panes of the door and then to reach down to open the door. The door was locked, and Munoz-Guerra told the officers that he would go get the key. Concerned that he might destroy evidence or get a weapon, the agents kicked open the door and made entry into the condominium. They conducted a security search and discovered a large quantity of marihuana, some cocaine, and two pistols.

The district court concluded that the officer's observations of drugs in plain view gave probable cause for the search and the failure to obtain a warrant was excused because reasonable concern for the officers' safety required an immediate protective search. We reversed, holding that the relevant point in determining whether exigent circumstances existed was not at the moment when the officers confronted Munoz-Guerra from the patio but, rather, before he was aware of their presence. We concluded that the agents had created the exigency by confronting Munoz-Guerro in his home under circumstances that were likely to necessitate a protective search of the home. "Warrantless entry was thus a foregone conclusion the instant the agents revealed themselves to Munoz-Guerra at the patio door."[27] Thus, the question before the court was "whether exigent circumstances justified the agents' initial decision to approach the patio door."

The matter at bar is similar to **Munoz-Guerra** in all relevant respects. The police here believed the suspects to be armed and in possession of easily-disposed-of illicit drugs. Yet, without justification, they abandoned their secure surveillance

---

[27]**Munoz-Guerra**, 788 F.2d at 298.

positions and took action they believed might give the suspects cause and opportunity to retrieve the weapons or dispose of the drugs. Their decision to take this action was not justified by an absence of time to secure a warrant or by any other reasonable predicate. The record is devoid of evidence that an exigency was created by the suspects' awareness of police surveillance,[28] or that the suspects were attempting to leave the premises with drugs,[29] or otherwise seeking to dispose of same.[30] No exigency was an otherwise natural occurrence during the course of the police investigation.[31] The police may not now rely on these circumstances of their own making to support the proposition that the warrant requirement should be excused.[32]

We therefore must consider whether exigent circumstances existed prior to

---

[28]**United States v. Randall**, 887 F.2d 1262 (5th Cir. 1989) (distinguishing **Munoz-Guerra** where there was reason to believe that the suspects had detected the D.E.A. surveillance or were imminently likely to do so and seller/target had demanded money from the informant/purchaser and would expect its delivery within a short time).

[29]**United States v. Rico**, 51 F.3d 495 (5th Cir. 1995) (distinguishing **Munoz-Guerra** where agent could reasonably believe that a felony suspect was preparing to depart in a vehicle possibly containing contraband).

[30]**United States v. Kinzer**, 87 Wash.App.1042 (1997) (distinguishing **Munoz-Guerra** where police had a legitimate, immediate concern that a small amount of cocaine was about to be consumed).

[31]**United States v. Capote-Capote**, 946 F.2d 1100 (5th Cir. 1991) (distinguishing **Munoz-Guerra** where police reasonably sent informant into an apartment without money and appellants created exigent circumstance by demanding payment within minutes).

[32]**Rico**, 51 F.3d 495, 503 ("the government cannot rely on exigent circumstances to excuse a warrantless entry to conduct a protective sweep if the circumstances and thus the sweep were made necessary by the law enforcement officers' decision to abandon a covert surveillance and confront the suspects without any justification whatsoever.")

the time that the police approached the residence itself, and do so considering these factors:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic.[33]

Officer Vasquez testified that a warrant could have been obtained within 30 minutes to an hour, provided that they had probable cause for the search. When the agents determined to approach the house, there existed no urgency which had to be resolved within that period of time. The government does not suggest otherwise. There is no evidence that the suspects were about to remove contraband from the Elena Street residence, nor is there evidence of a possibility of danger to the police officers guarding the site while they developed probable cause and sought a warrant. There is no indication that the suspects were aware that the police were monitoring them or the house. Even considering the ready destructibility of contraband as counseled by **Morales**' fifth factor, the circumstances prevailing when the police went to the residence fall far short of the type of emergency situation that would authorize an intrusion otherwise violative of the fourth amendment. Any conclusion that exigent circumstances existed herein justifying entry without a warrant would be clear error.

---

[33]**United States v. Morales**, 171 F.3d 978, 982 (5th Cir. 1999).

*Vega's Consent*

The government maintains that the search which revealed the illegal contraband at the Elena Street residence was performed by virtue of the consent to search granted by Vega who, the government claims, had apparent authority to give such consent. Assuming *per arguendo* that Vega had apparent authority to consent to the search, however, his consent would not have been sufficient to purge the taint of the prior unlawful search. When evidence is obtained pursuant to a consent to search which follows on the heels of a fourth amendment violation, we consider not only whether the consent itself was voluntarily given, but also whether it was independent of the violation to such a degree as to cause a "break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation."[34] This analysis applies even when, as here, the person who gave consent was not the person whose constitutional rights were violated.[35]

---

[34]**United States v. Miller**, 146 F.3d 274, 279 (5th Cir. 1998), citing **Brown v. Illinois**, 422 U.S. 590 (1975); **United States v. Chavez-Villareal**, 3 F.3d 124 (5th Cir. 1993).

[35]If the **Chavez-Villareal** rule were directed toward a different set of concerns, this might not be so. In **Brown v. Illinois**, the Supreme Court observed the dual purposes behind application of the exclusionary rule to a suspect's statement made following a fourth amendment violation. In that case, the police made an unlawful entry into Brown's apartment and arrested him without probable cause. While in police custody, and after having been given the **Miranda** warning, Brown signed a confession. The Court noted that overlapping constitutional rights apply to such a statement obtained as the result of an unlawful search. The fifth amendment concerns involved were directed primarily at the propriety of the confession. Brown's fifth amendment right against self incrimination required exclusion of the statement if it were not voluntarily given. With regard to this issue, the unlawful entry into the house, and Brown's arrest, were merely evidence of coercion which might have been diluted by the Miranda warning. The fourth amendment concerns involved were directed primarily at the initial arrest of Brown. The exclusionary rule required the exclusion of the confession if it were derived from the exploitation of the illegal search. With regard to this issue, the confession by Brown was viewed as evidence obtained as a result of that arrest. The Court concluded that the Miranda warning was not enough, alone and *per se*, to break the causal chain between the two.

As we explained in **United States v. Chavez-Villareal**,[36]

> To determine whether the causal chain was broken, we consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. The burden of showing admissibility rests on the government.[37]

All three of the **Chavez-Villareal** factors counsel in favor of the conclusion that Vega's consent did not interrupt the causal chain from the violation to the evidence. The consent was given in close temporal proximity to the unlawful intrusion. Officer Vasquez's testimony described a continuous series of events: he and the other officers entered the house, removed Izquierdo and Companion from their hiding places, and questioned them; Izquierdo and Companion identified Vega as the owner of the house; Vasquez asked Vega for his consent. Although Vasquez

---

In **Chavez-Villareal**, we considered the admissibility of evidence obtained as the result of consent to search given during an unlawful traffic stop. Although both interests were fourth amendment interests, **Chavez-Villareal** exhibited an overlapping of interests similar to those in **Brown**. There existed a fourth amendment concern about the voluntariness of the consent because any search premised on a grant of consent coerced by the police is unreasonable under the fourth amendment. **Bumper v. North Carolina**, 391 U.S. 543 (1968); **Schneckloth v. Bustamonte**, 412 U.S. 218 (1973). There also existed a fourth amendment concern about whether the evidence found in Chavez-Villareal's vehicle was fruit of the poisonous tree, or his consent purged the taint of the initial unlawful stop. We applied the reasoning in **Brown**, and concluded that the proper approach was to consider both the coercive effect of the initial constitutional violation (as well as the effect of other factors) on the subsequently obtained consent, and whether the causal link between the constitutional violation and the evidence had been broken by the consent.

The second prong of the **Chavez-Villareal** rule is therefore nothing more than a specific application of the fruit of the poisonous tree doctrine, which frequently has been held to exclude evidence from being used against a defendant whose fourth amendment rights have been violated, even when the evidence is obtained from a third party, if the causal connection between the violation and the evidence has not been severed. See, e.g., **Wong Sun v. United States**, 371 U.S. 471 (1963).

[36]3 F.3d 124 (5th Cir. 1993).

[37]**Chavez-Villareal**, 3 F.3d at 128.

did not testify as to the amount of time from the violation until he sought Vega's consent, his testimony reflects that the whole episode took only a very few minutes. The second factor, the presence of intervening circumstances, lends no aid to the government's position; no such circumstances existed, and the government does not suggest otherwise. Finally, the officers' conduct appears to have been calculated to allow the police to search without probable cause. As noted, Officer Vasquez acknowledged that they approached the house without probable cause. As in **Brown**, the police "embarked upon this expedition for evidence in the hope that something might turn up."[38] These types of "expeditions," in which the police intrude upon fourth amendment interests without probable cause and, in the confusion following the breach, attempt to employ constitutionally curative measures to legitimize their actions, are precisely the type sought to be deterred by **Chavez-Villareal**.[39] A denial of Izquierdo's motion because of Vega's "consent," would be clear error.

**Intimidation of Potential Jurors**

During voir dire, the district court asked the panel if anyone could not fairly consider the case. One potential juror responded that she was employed at the Bayview Detention Center and could not be fair. The district judge opined that she did not want to serve and told the prospective juror that the court was "not

---

[38]**Brown**, 422 U.S. at 605.

[39]**Miller**, 146 F.3d at 280.

20

impressed" with her excuse. Vega contends that these statements sent a message to the remaining members of the venire that honest answers about bias would be met with reprisal. He further contends that the comments were an abuse of the trial judge's discretion in conducting voir dire and therefore warrant a new trial.

Ordinarily we presume that prospective jurors respond honestly and completely to questions about circumstances that might affect their ability to render an unbiased verdict.[40] This presumption fades, however, when the trial judge intimidates the prospective jurors and thereby "cut[s] off meaningful responses to critical questions."[41] Where this "vital flow of information from venire to court"[42] is lost, so is our assurance of an impartial adjudicator and counsel's ability to exercise a reasonably knowledgeable right of challenge, and a new trial is therefore required.[43]

We disagree with Vega's contention the trial judge's comments were similar in degree and kind to the intimidation extant in **United States v. Rowe**. In **Rowe**, the judge began the proceedings by instructing the courtroom marshal, in the presence of the venire panel, to "pick up" a prospective juror who failed to appear in court so that she might show cause why she should not be held in contempt of court. The judge then turned to the jurors and asked, "Now aren't you all glad you

---

[40]**United States v. Rowe**, 106 F.3d 1226 (5th Cir. 1997).

[41]**Id.** at 1230.

[42]**Id.**

[43]**Id.** at 1229.

appeared?" Later, when one member of the venire said she could not be unbiased because two of her family members were law enforcement officers, the judge challenged her sincerity and added

> All right. Put her on February, March, and April's panel to come back. And you will be coming back again, and again, and again .... And see if you can figure out how to put aside your personal opinions and do your duty to your country as a citizen, because this kind of answer which is clearly made up for the occasion is not really great. You are excused.[44]

The court in **Rowe** similarly challenged another venire member and, after again threatening to force the prospective juror to return for repeated jury duty, suggested she secure "some remedial constitutional inquiries in the meantime."[45] Several weeks later, a member of the venire came forward and stated she was prepared to testify that after the judge's admonishments she "felt like she had no recourse but to sit there and keep her mouth shut, and that was the best thing she could do."[46]

The trial judge herein did not expressly or impliedly threaten to punish venire members who claimed bias. Her comments cannot be characterized as a harsh rebuke or as a sanction against the venire member. No prospective or serving juror in this case has suggested that he or she was intimidated. That the trial judge criticized a prospective juror does not automatically warrant the granting of a new

---

[44]**Id.** at 1228.

[45]**Id.**

[46]**Id.** at 1229.

trial.  Indeed, in **United States v. Shannon**[47] we recognized that some degree of admonishment is within the trial court's discretion.  Here, as in **Shannon**, we do not believe the trial judge's comments deprived the defendant of a fair and impartial jury by preventing meaningful communication with prospective jurors.

**Exclusion of Companion's Statement**

As previously noted, Companion entered a guilty plea.  Vega maintains that during his plea colloquy Companion "shouldered all of the blame for the offenses in question."  Vega sought to introduce that statement, but the trial court granted the government's motion in limine excluding it as hearsay.  Vega insists that the statement should have been admitted as a declaration against penal interest under Rule 804(b)(3) of the Federal Rules of Evidence.

> In order for hearsay evidence to be admissible under Rule 804(b)(3):
>
> (1) The declarant must be unavailable; (2) The statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) The statement must be corroborated by circumstances clearly indicating its trustworthiness.[48]

We review a trial judge's decisions regarding the admissibility of evidence for

---

[47]21 F.3d 77 (5th Cir. 1994).  In **Shannon**, when a prospective juror professed not to be able to be fair before being asked directly whether he was biased, the trial judge responded:

> Well, I don't think that is right and I didn't ask you for that answer ... That is an unfair thing for you to say.  If you can't serve you can't serve.  You will report back upstairs and I will let them know about you and you are excused at this time but I admonish you that if you answer a question in another courtroom just answer the question ... And don't volunteer an answer.

[48]**United States v. Dean**, 59 F.3d 1479, 1492 (5th Cir. 1995).

abuse of discretion[49] and will uphold a determination as to the trustworthiness of an out-of-court statement unless it is clearly erroneous.[50] Vega has failed to point to any evidence corroborating Companion's statement. We cannot say the trial court abused its discretion in refusing to admit Companion's statement under Rule 804(b)(3).

For the foregoing reasons, we VACATE the convictions and sentence of Izquierdo, REVERSE the district court's denial of his motion to suppress evidence, including statements, obtained at the Elena Street and Taft Street residences and REMAND for further proceedings consistent herewith. The convictions and sentence of Vega are AFFIRMED.

---

[49]**United States v. Shaw**, 920 F.2d 1225 (5th Cir. 1991).

[50]**Dean**, 59 F.3d 1479.