**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose Antonio ORTIZ, Jr., Defendant–Appellant.**

No. 12–40101.

United States Court of Appeals, Fifth Circuit.

Jan. 9, 2013.

Renata Ann Gowie, Assistant U.S. Attorney, U.S. Attorney's Office, Houston, TX, for Plaintiff–Appellee.

Joseph R. Barroso, Corpus Christi, TX, for Defendant–Appellant.

Before HIGGINBOTHAM, SMITH, and ELROD, Circuit Judges.

PER CURIAM: *

A jury convicted Jose Ortiz, Jr., of two counts of possession with intent to distribute methamphetamine and one count of conspiracy to commit the same. Ortiz contends that the district court erred by denying his motion to suppress evidence and in responding to a question from the jury. Because Ortiz lacks Fourth Amendment standing to contest the allegedly illegal search, and because the supplemental jury instructions do not constitute plain error, we affirm.

I.

Police arrested Ortiz after receiving a tip from a confidential informant that Ortiz was offloading narcotics at a residence. Officers surveilled the house and observed

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

suspicious activity corroborating the tip. They discovered a false compartment in a parked van, which they searched with the consent of its driver. Law enforcement subsequently searched the house, without permission or a warrant, and found a "user amount" of cocaine in plain view. After obtaining a warrant, they discovered the methamphetamine that served as the basis of the conviction.

Ortiz moved to suppress all evidence seized as a result of the search. The district court denied the motion, finding that Ortiz lacked standing to challenge the search and alternatively that the officers had the right to enter the premises to conduct a protective sweep and prevent the destruction of evidence.

## II.

Because a defendant's standing to contest an allegedly illegal search is a question of law, we review *de novo*. *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037 (5th Cir.1990). "[W]e must accept the district court's findings of underlying facts unless clearly erroneous." *United States v. Cardoza–Hinojosa*, 140 F.3d 610, 614 (5th Cir.1998).

## III.

"[S]tanding to contest the validity of a search under the [F]ourth [A]mendment.... depends on whether [a] defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched ... which society would recognize as reasonable." *Kye Soo*

*Lee*, 898 F.2d at 1037–38 (citing *Rakas v. Illinois*, 439 U.S. 128, 151, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Although the Fourth Amendment protects people, not places, *see Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), whether a person has a reasonable expectation of privacy often depends on where he is, *see Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

■ Although Ortiz was—or at least believed himself to be[1]—legitimately on the premises where the search occurred, that consideration alone is insufficient to establish a reasonable expectation of privacy. *United States v. Vega*, 221 F.3d 789, 798 (5th Cir.2000). The lead police investigator testified Ortiz was paying his second cousin John Gomez to use the residence. Ortiz argues this payment conferred on him an expectation of privacy in the residence that society would recognize as a reasonable.

In *Vega, id.* at 795–96, we held that a lessee's expectation of privacy in a leased residence is presumptively reasonable, relying on "concepts of real property law" and the lessee's "possessory interest" in the leased property. But even accepting that Ortiz paid Gomez to use the residence—a point on which the record is not entirely certain—Gomez lacked the power to convey a valid leasehold interest to Ortiz. Under elementary principles of Texas real property and agency law, a person cannot convey an interest in property he does not own absent actual or apparent authorization from the owner.[2]

1. John Gomez, Ortiz's second cousin, gave Ortiz a key to the house to store a jet ski in the garage. Gomez asserted, however, that Ortiz's permission to be on the premises, such as it was, did not extend to the residential portion of the house.

2. *See, e.g., Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex.2007) ("An agent's authority to act

on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority.")); *see also IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex.2007) ("Texas law does not presume agency, and the party who alleges it has the burden of proving it.").

It is undisputed that Gomez held no possessory interest in the residence, which was owned by Gina Brambila and inhabited by her sister Veronica Mungia, Gomez's former girlfriend. Nor does the evidence show that Gomez had authority to let the premises on the sisters' behalf: He apparently never interacted with Brambila, and though Mungia gave Gomez a key to the property, she did so "just for him to go by there and check on it" while she was out of town.[3]

Even if Mungia's transfer of the key vested Gomez with apparent authority to act on *Mungia's* behalf, the record is devoid of evidence she had a leasehold interest that could be sublet to Ortiz: Mungia lived in the residence on a permissive basis without ever paying rent to Brambila. Given that Ortiz bears the burden of proving the reasonableness of his expectation of privacy by a preponderance of the evidence, there is insufficient evidence in the record to support a conclusion that Ortiz held any sort of legally cognizable possessory interest in the Brambila's residence property akin to the leasehold interest held by the defendant in *Vega.*

Rather, Ortiz's legal position *vis-a-vis* the residence where the search occurred is almost exactly analogous to that of the defendant in *Carter,* who gave the rightful lessee of an apartment an eighth of an ounce of cocaine in exchange for the right to use that apartment briefly to bag drugs. *See Carter,* 525 U.S. at 86, 119 S.Ct. 469. In ruling on the motion to suppress evidence gathered from the apartment, the Supreme Court attached no significance to that in-kind payment. *See id.* at 90, 119 S.Ct. 469. As discussed below, the circumstances in the present case are essentially identical to those in *Carter,* save for the

fact that Ortiz made his alleged payments in cash, not in kind.

*Carter* instructs that whether Ortiz had a reasonable expectation of privacy in Brambila's house turns on whether the visit was primarily commercial or social. *United States v. Phillips,* 382 F.3d 489, 496 (5th Cir.2004). "An expectation of privacy in commercial premises ... is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). In assessing the nature of a visit, factors include (1) the relationship between the guest and householder, (2) the length of the visit, and (3) whether the residence was "simply a place to do business." *Phillips,* 382 F.3d at 496 (quoting *Carter,* 525 U.S. at 90, 119 S.Ct. 469).

As discussed above, Ortiz's connection to both Mungia (the lawful resident) and Brambila (the homeowner) was even more tenuous than was the connection of the similarly-situated defendant in *Carter,* who did not have a reasonable expectation of privacy even though he received explicit permission from the lessee to use the apartment. *See Carter,* 525 U.S. at 86, 119 S.Ct. 469. As with the defendant in *Carter,* Ortiz spent only a few hours at the residence before his arrest. Unlike the houseguest found to have an expectation of privacy in *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), Ortiz never stayed overnight there; for him, the house was "simply a place to do business." *Carter,* 525 U.S. at 90, 119 S.Ct. 469.

Though his jet ski was stored in the garage as a sort of a personal favor from his cousin Gomez, Ortiz—like the defen-

---

**3.** Though Gomez subsequently informed Mungia that he had given the key to Ortiz—ostensibly so that Ortiz could store his jet ski in the garage—Mungia's reluctant acquiescence in that arrangement was hardly an authorization to let the premises.

dant in *Carter*—traveled to the residence for the sole purpose of engaging in drug trafficking. *See id.* at 86, 119 S.Ct. 469. He was, at most, "merely legitimately on the premises," *see Vega,* 221 F.3d at 798, so he cannot claim a reasonable expectation of privacy in his second cousin's ex-girlfriend's sister's home. The district court did not err when it denied the motion to suppress.[4]

### IV.

Ortiz contends, for the first time on appeal, that the district court erred in its response to a note from the jury reading as follows: "If I am at a friends [*sic*] house and they bust and find drugs, am I guilty of possession and conspiracy because I am present at the house." In answering, the court orally gave lengthy supplementary instructions that included the following:

> Congress intends to penalize possession of a drug that is knowingly possessed with the intention of distribution. That's what Congress is after. *And that's what the United States has said and has offered to you through these witnesses.* That what's this indictment charges at two and three when the words "knowingly" and "intentionally" are present.
>
> . . .
>
> And even if you know of the drug, that's not enough unless you've joined that conspiracy; if you've made yourself part of the deal, whether it's in writing, is formalized as the Magna Carta or *as simple as text messages and phone calls.*

(Emphasis added.)

About half an hour after receiving the court's oral response to its note, which was

submitted approximately one-and-a-half hours into its deliberations, the jury reached its verdict. Ortiz did not contemporaneously object to the supplemental instructions but now argues that the portions excerpted above constitute improper commentary on the credibility of government witnesses and the evidence.

### A.

Because Ortiz failed to object, we review for plain error only. *See United States v. Ramos,* 537 F.3d 439, 456 (5th Cir.2008). The plain-error test has four prongs:

> An appellate court may not correct an error the defendant failed to raise in the district court unless there is (1) error; (2) that is plain; and (3) that affects substantial rights. If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*United States v. Garcia,* 567 F.3d 721, 726 (5th Cir.2009) (internal quotations and citations omitted). "Plain error occurs only when the instruction, considered as a whole, was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice." *Id.* at 728 (quoting *United States v. Davis,* 19 F.3d 166, 169 (5th Cir.1994)).

### B.

"With respect to supplemental jury instructions, 'appellate courts are guided by lofty, but very general, propositions and admonitions.'" *United States v. Le,* 512 F.3d 128, 132 (5th Cir.2007) (quoting *Unit-*

---

4. Because Ortiz does not have standing, we need not consider the alternative bases for the ruling denying the motion to suppress.

ed States v. Carter, 491 F.2d 625, 633 (5th Cir.1974)). In applying the plain-error test, we consider, among other factors, whether "the [district] court's answer was reasonably responsive to the jury's questions and whether the original and supplemental instructions as a whole allowed the jury to understand the issue to presented to it." Id. (quoting United States v. Cantu, 185 F.3d 298, 306 (5th Cir.1999)). We reverse a conviction only "if the allegedly harmful instructions were either so overwhelmingly misleading as to be incurable, or were not effectively cured by statements elsewhere in the charge...." United States v. Wilkinson, 460 F.2d 725, 732 (5th Cir.1972).

▉ Ortiz contends that it was improper for the court to tell the jury that "the government had offered to you through these witnesses" evidence of knowing possession with intent to distribute, because the comment unfairly invaded the jury's territory.[5] A judge "has a wide latitude in commenting on the evidence during his instructions to the jury, but ... has no power to direct a verdict of guilty." Mims v. United States, 375 F.2d 135, 148 (5th Cir.1967).

Although maybe inartful in its suggestion that the government had made a prima facie case, the court's comment contained no judgment concerning the credibility of the government's witnesses. Nor did the offhand statement purport to remove the role of factfinding from the jury.[6] Indeed, two sentences later, the court emphasized the jury's role in as-

sessing the evidence: "I don't know how you view these facts but that's why I say this is not a question necessarily that you should have asked me because this whole case depends upon knowledge and intent." (Emphasis added.)

Ortiz also objects to the portion of the supplemental instructions stating that an agreement constituting conspiracy could be as "formalized as the Magna Carta or as simple as text messages and phone calls." That was erroneous, Ortiz insists, because it told the jury to look to the text messages and phone calls actually in evidence as probative of the government's case. Context indicates, however, that the primary function of the comment was to define the range of agreements that could legally fall within the ambit of conspiracy. One end of the range coincides with the actual evidence offered in this case, but the invocation of the Magna Carta at the other end precludes reading the comment as a literal instruction.[7]

Although Ortiz points to two allegedly erroneous phrases in the more than three pages of supplemental instructions, "[w]e are mindful ... that in evaluating a trial judge's instructions we must not isolate statements which may in themselves appear to be prejudicial, but must look to the charge as a whole." Dopf, 434 F.2d at 205. Taken as a whole, the supplemental instructions primarily consist of a thorough explication of the relevant legal principles. Moreover, they include repeated, specific references to the indictment and original

5. See United States v. Williams, 447 F.2d 894, 902 (5th Cir.1971) ("[D]etermination of the credibility of witnesses is the jury's proper function, not the court's.")

6. Cf. United States v. Dopf, 434 F.2d 205, 208 (5th Cir.1970) ("The constant and emphatic repetition by the Court that the evidence of guilt was overwhelming and ample for con-

viction [ ] effectively deprived the jury of their traditional fact-finding function....") (emphasis added).

7. Cf. United States v. Carter, 491 F.2d at 630–33 (finding reversible error where hypothetical in supplemental instructions "strongly emphasiz[ed] the theory of the prosecution").

instructions, a copy of which was given to each individual juror.

Although Ortiz posits that, in response to the jury's question, the court should have just referred to the portion of the original instructions concerning "mere presence," such a "cursory" response might have been legally insufficient. *See United States v. Anderton,* 629 F.2d 1044, 1047–49 (5th Cir.1980). Moreover, that the court chose to refer to the original "mere presence" instruction *and* expound further in light of the jury's evident uncertainty was well within its "wide latitude in commenting on the evidence." *Mims,* 375 F.2d at 148. The supplemental instructions, though verbose, easily satisfy the requirement of being "reasonably responsive." *See Le,* 512 F.3d at 133.

In addition to being presumptively proper, *see id.,* the supplemental instructions' references to the original instructions served a curative function, given that the eighteen-page original instructions include the following statement:

> [D]o not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

*Accord Wilkinson,* 460 F.2d at 732. Although "the judge's last word is apt to be the decisive word," *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946), any error in the supplemental instructions was not "so 'plain' [that] the trial judge and prosecutor were derelict in countenancing it," *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Nor were the original and supplemental instructions, taken as a whole, "so clearly erroneous as to result in the likelihood of a grave miscar-

riage of justice." *Garcia,* 567 F.3d at 728. Because Ortiz's newly-raised objection to the supplemental jury instructions fails at least at prong two of the plain-error test, we need not reach the remaining prongs.

The judgment of conviction is AFFIRMED.