**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 97-40290

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMIRO CARDOZA-HINOJOSA,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

April 29, 1998

Before REYNALDO G. GARZA, DUHÉ, and STEWART, Circuit Judges.

STEWART, Circuit Judge:

Ramiro Cardoza-Hinojosa ("Hinojosa") appeals his conviction, entered pursuant to a conditional plea of guilty, for possession of cocaine with intent to distribute. He alleges that the district court erred by denying his motion to suppress cocaine that was discovered in a shed located between his home and an auto repair shop.

Contending that he pays property taxes on the shed and that he operates a part-time welding business therefrom, Hinojosa asserts an expectation of privacy in the shed's enclosed area which he claims was unconstitutionally infringed by narcotics officer Eluid Plata's ("Plata") warrantless search of the shed and ensuing discovery of the cocaine therein. Finding that Hinojosa did not possess a reasonable expectation of privacy in the shed at the time of Plata's search, we conclude that Hinojosa lacks standing to raise the instant Fourth Amendment challenge. The district court's denial of Hinojosa's motion to suppress is therefore affirmed.

**I.**

**FACTUAL BACKGROUND**

The underlying facts of this case are, for the most part, undisputed. On September 17, 1996, Texas Department of Public Safety Narcotics Service ("DPS") Officer George Olivo ("Olivo"), while working undercover, received information from a confidential informant that Hinojosa was attempting to organize a sale of approximately two kilograms of cocaine on someone else's behalf. The informant, posing as the "middle man," was instructed to inform Hinojosa of Olivo's interest in "purchasing" one kilogram of cocaine.

At approximately 6:00 p.m. that evening, the informant called Olivo at the DPS office and informed him that Hinojosa desired an advance payment for the cocaine. After Olivo agreed to this condition, the informant handed the telephone to Hinojosa, who then negotiated the purchase price of $14,300 directly with Olivo. In addition, Hinojosa and Olivo agreed that delivery of the cocaine would occur at the Weslaco Tourist Bureau in Weslaco, Texas. Hinojosa agreed to contact Olivo with further details after he (Hinojosa) had an opportunity to speak with the source of the cocaine.

After this call was concluded, Hinojosa put the informant in touch with Roberto Reyes-Cardoza ("Cardoza"), the source of the cocaine at issue in this case and the person on whose behalf Hinojosa organized the instant transaction. Later that evening, Hinojosa and the informant traveled to Cardoza's residence in Edcouch, Texas, to retrieve the cocaine. The informant called Olivo from Cardoza's residence and informed him that Hinojosa and Cardoza wanted to meet him in front of Gilberto's Auto Repair, a business establishment located near Hinojosa's home in La Feria, Texas.[1] Olivo agreed to this proposed meeting place. He then arranged for surveillance and various back-up elements to accompany him there.

When Olivo arrived at Gilberto's Auto Repair, the informant and Cardoza were waiting for him. Hinojosa was not present because he had gone to a nearby store to purchase beer. As Olivo and Cardoza began to discuss the execution of the transaction, Cardoza announced that he preferred

---

[1]Hinojosa's residence and Gilberto's Auto Repair are located adjacently to each other, and are separated only by a series of small garage-like rooms (*i.e.,* sheds) which abut Gilberto's Auto Repair.

2

to close the deal at the present location. After Olivo stated that he had the necessary funds to proceed, Cardoza pulled a package out of his car, stuck the package under his shirt, and requested that they "do the business inside the shop." Cardoza and Olivo proceeded to enter one of the small sheds separating Gilberto's Auto Repair and Hinojosa's residence. Needless to say, the door to the shed was unlocked.

Once inside, Cardoza removed the package from his shirt and allowed Olivo to examine its contents. After confirming that the substance was cocaine, Olivo stepped outside under the pretense of having to retrieve the purchase money, and gave the surveillance team the prearranged arrest signal. At that very moment, Hinojosa drove up in the informant's car, beer in hand. According to Olivo, Hinojosa did not seem surprised to see Olivo exiting from the shed.

The arrest team quickly converged on the scene and arrested Hinojosa without incident.[2] When Cardoza saw what was happening, he fled from the shed, leaving its rear door wide open. He was apprehended a few minutes later in a large grassy field behind Gilberto's Auto Repair.[3] At the time of his arrest, Cardoza was not in possession of the cocaine.

Because the officers on the scene assumed that Cardoza had discarded the cocaine in the field behind Gilberto's Auto Repair, they began to search for it in the vicinity of where he was apprehended. This flashlight sweep of the area proved futile, however. Approximately fifteen minutes after the officers had begun their search, Officer Plata entered the shed from which Cardoza had fled, and "within a minute or so" found the cocaine on the second shelf of an open tool box. Plata used a flashlight to conduct this search. Plata's entry into the shed was sanctified neither by a warrant, nor Hinojosa's or Cardoza's consent.

**PROCEDURAL HISTORY**

Pursuant to the aforementioned discovery of the cocaine, Hinojosa and Cardoza were indicted for federal drug offenses on two counts: (1) conspiracy to possess with intent to distribute cocaine

---

[2]In addition to arresting Hinojosa, the officers "arrested" Olivo to maintain his cover.

[3]Cardoza, like Hinojosa, was not armed at the time he was apprehended.

3

in violation of 21 U.S.C. § 846 and (2) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Hinojosa thereafter filed a motion to suppress the cocaine. After conducting an evidentiary hearing on the matter, the district court denied Hinojosa's motion from the bench. Pursuant to the court's invitation, however, the parties submitted additional briefs on the pertinent issues.

On February 11, 1997, the court issued a written order denying Hinojosa's motion to suppress the cocaine. Specifically, the court found that: (1) Hinojosa did not possess a reasonable expectation of privacy in the shed where the cocaine was found; (2) Plata's search of the shed was justified by exigent circumstances; and (3) the cocaine was otherwise admissible under the "good faith" exception to the exclusionary rule.[4] Faced with the prospect of trial, Hinojosa pled guilty to Count 2 of the indictment—reserving his right to appeal the denial of his suppression motion—and received a sentence of 60 months incarceration.[5] Hinojosa now brings this appeal challenging the district court's denial of his motion to suppress.

## II.

"A district court's ruling on a motion to suppress based upon live testimony at a suppression hearing is accepted unless clearly erroneous or influenced by an incorrect view of the law." United States v. Wilson, 36 F.3d 1298, 1303 (5th Cir. 1994). Not only do "we view[] the facts in the light most favorable to the prevailing party, which in this case is the government," United States v. Howard, 106 F.3d 70, 73 (5th Cir. 1997) (internal quotation omitted), but we must accept the district court's findings of underlying facts unless clearly erroneous. United States v. Kelley, 981 F.2d 1464, 1467 (5th Cir. 1993), cert. denied, 508 U.S. 944, 113 S.Ct. 2427, 124 L.Ed.2d 647 (1993).

---

[4]Conceding that the evidence supporting the district court's finding of exigent circumstances is "scanty at best," the government on appeal does not argue forcefully that Plata's search was justified under that doctrine. While the import of the government's concession in this regard is diminished by our affirmance of the district court's ruling on an alternative ground, see discussion infra, our review of the record confirms that the government's assessment of the evidence concerning exigent circumstances is indeed accurate.

[5]In exchange for Hinojosa's plea, the government dismissed Count 1 of the indictment.

Questions of law, however—including whether an expectation of privacy is reasonable under the circumstances, United States v. Smith, 978 F.2d 171, 176 (5th Cir. 1992), cert. denied, 507 U.S. 999, 113 S.Ct. 1620, 123 L.Ed.2d 179 (1993)—are reviewed de novo, as is the district court's ultimate determination of Fourth Amendment reasonableness, Wilson, 36 F.3d at 1304 (citation omitted).

The Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), requires that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. It is settled law that the Fourth Amendment's protections against arbitrary searches and seizures are presumptively applicable not only in an individual's home, but also in any commercial premises he may own or use. United States v. Blocker, 104 F.3d 720, 726 (5th Cir. 1997). Hinojosa contends that the shed in which Plata discovered the cocaine was his commercial welding shop, and therefore Plata's warrantless entry into the shed's enclosed area was violative of the Fourth Amendment.

Although the evidentiary burden on Hinojosa to prove a contravention of his Fourth Amendment rights is relatively light—he must prove such a violation by a preponderance of the evidence, Kelley, 981 F.2d at 1467 (citation omitted)—he must demonstrate as an initial matter that he has standing to challenge the government's actions. See Wilson, 36 F.3d at 1302 ("[The proponent of a motion to suppress] has the burden of showing that he has standing."). In this case, the government asserts that Hinojosa has no standing to contest Plata's search of the shed (and seizure of the cocaine found therein) because he had no expectation of privacy in the shed's enclosed area at the time of the search. See United States v. Ibarra, 948 F.2d 903, 905 (5th Cir. 1991) ("To establish a Fourth Amendment violation, [the proponent of a motion to suppress] must show that [he] had a legitimate expectation of privacy in the area searched.").

5

This circuit utilizes a two-pronged inquiry to determine whether a defendant has the requisite reasonable expectation of privacy to contest the validity of a search under the Fourth Amendment. Such a determination depends on:

> (1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and
> (2) whether that expectation of privacy is one which society would recognize as reasonable.

United States v. Kye Soo Lee, 898 F.2d 1034, 1037-38 (5th Cir. 1990). In this case, after conducting an evidentiary hearing, the district court held that under the totality of the circumstances society would "not [be] prepared to recognize [Hinojosa's privacy interest] in the shed as a reasonable expectation of privacy protected by the Fourth Amendment."

As mentioned, the Fourth Amendment proscription against unreasonable searches ordinarily extends to protect an individual's privacy interest in commercial premises. In this case, the district court made a factual finding that "[Hinojosa] operates a small welding business out of the shed." Our review of the record reveals considerable evidence to support this finding. At the suppression hearing, Hinojosa testified that he utilized the shed to perform part-time welding work for customers. In addition, he testified that his father owns both the shed and the adjacently-located Hinojosa residence, and that he (Hinojosa) pays the property taxes on both structures.[6] The government did not challenge either of these testimonial claims below. Indeed, Olivo, a government witness, testified that the inside of the shed looked like a "mechanic's shop" because it contained welding equipment and various tools.

In addition, the record does not indicate, nor has the government contended, that Gilberto's Auto Repair—a neighboring business that is presumably open to the public—is in any way connected to Hinojosa or, more importantly, to the shed at issue in this case. Both Olivo and Plata testified that, to the best of their knowledge, Gilberto's Auto Repair was not accessible from the interior of the

---

[6]Hinojosa introduced into evidence a county tax statement charging him for property taxes on the shed.

6

shed. By all indications, then, Gilberto's Auto Repair is a separate business which, although located next to the shed at issue, is irrelevant to our inquiry in this case. After reviewing the record as a whole, and based on the foregoing evidence, we find that the district court did not clearly err in determining that Hinojosa operated a welding enterprise out of the shed. The Fourth Amendment thus presumptively protected Hinojosa against arbitrary government searches of the shed's premises.

The district court nevertheless found that officer Plata's warrantless entry into (and search of) the shed was valid because, like the warrantless *reopening* of a container upheld in Illinois v. Andreas, 463 U.S. 765, 103 S.Ct . 3319, 77 L.Ed.2d 1003 (1983), it followed a previously lawful entry (*i.e.,* Olivo's) that revealed to a certainty the presence of contraband therein. In Andreas, a lawful border search at an airport revealed marijuana concealed inside a three-foot-wide wooden table that was shipped in a large, metal container. After the table and the container were resealed, a Drug Enforcement Administration ("DEA") agent and a local police officer executed a "controlled delivery" of the container to its intended recipient (*i.e.*, the "suspect"). At the suspect's request, they left the container in the hallway outside his apartment. While the police officer left to obtain a search warrant for the suspect's apartment, the DEA agent remained inside the building. Although the agent observed the suspect drag the container into the apartment, he was unable to maintain constant surveillance of the apartment door. Between thirty and forty-five minutes after the delivery, but before the police officer returned with a warrant, the suspect left his apartment with the container and the agent immediately arrested him. At the police station, the officers reopened the container without a warrant and found the marijuana inside the table. See Andreas, 463 U.S. at 767-69, 103 S.Ct. at 3322-23.

The Court framed the issue before it as follows: "[A]t what point after an interruption of control or surveillance[] [should courts] recognize [an] individual's expectation of privacy in [a] container as a legitimate right protected by the Fourth Amendment proscription against unreasonable searches." Id. at 772, 103 S.Ct. at 3325. The Court held that "absent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a

7

container previously opened under lawful authority." Id. at 773, 103 S.Ct. at 3325. The Court reasoned that "once a container [is] found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy [in the container's contents] is lost." Id. at 771-72, 103 S.Ct. at 3324 (footnote omitted). Applying these principles to the facts before it, the Court determined that "the unusual size of the container, its specialized purpose, and the relatively short break in surveillance[] combine[d] to make it substantially unlikely that the respondent removed the table or placed new items inside the container while it was in his apartment." Id. at 773, 103 S.Ct. at 3325. As such, the subsequent "reopening [of] the container did not intrude on any legitimate expectation of privacy," and the respondent lacked standing to raise a Fourth Amendment claim against it. Id. at 773, 103 S.Ct. at 3325.

Unlike the container in Andreas, however, which contained nothing but a table that concealed marijuana, Hinojosa's shed was a part-time workplace containing numerous possessions associated with his welding enterprise, among them various tools, equipment, and a tool box. The fact that Hinojosa's workplace contained these items cannot be deemed unusual, as an individual's workplace is *expected* to contain a number of personal and job-related possessions—unlike a shipped container intended primarily to conceal contraband. Hinojosa possessed a legitimate and significant privacy interest in the contents of his workplace, and this interest was not breached in its entirety merely because of Olivo's brief presence inside. Furthermore, it does not appear from the record that Olivo was even aware from his brief entry that the shed contained the tool box that was later discovered to harbor the cocaine, nor does it escape us that the officers' initial assessment, after Cardoza's flight from the shed, was that the cocaine was discarded in the field behind Gilberto's Auto Repair and was no longer contained in the shed. Andreas, which considered the validity of a warrantless second opening of a container, the contents of which (a) *were known to a certainty after an initial lawful opening* and (b) *were substantially likely to remain unchanged*, is thus distinguishable on its facts, and we decline to extend it to justify the government's warrantless reentry into Hinojosa's shed in this case. The district court's holding to the contrary was clear error.

8

We nevertheless find that under the analysis articulated by this court in Ibarra, 948 F.2d at 906, Hinojosa lacked a reasonable expectation of privacy in the shed at the time of Plata's warrantless search, and therefore he lacks standing to challenge the search under the Fourth Amendment. In Ibarra we identified the nuclei of factors to be considered in determining whether a reasonable expectation of privacy exists:

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises.

Id. (citing United States v. Haydel, 649 F.2d 1152, 1154-55 (5th Cir. Unit A July 1981), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982)). While no one of these factors is necessarily decisive, together they represent the concerns that should be addressed in determining whether a defendant has standing to object to a search under the Fourth Amendment. Haydel, 649 F.2d at 1154-55.

We begin our analysis of the Ibarra factors with the obvious. While Hinojosa indisputably had a possessory interest in the shed at the time of Plata's warrantless entry, the circumstances preceding Plata's entry reveal a careless (if not nonexistent) effort on Hinojosa's part to maintain a privacy interest therein. Not only did Hinojosa direct Olivo to meet him and his codefendant for a pre-transaction meeting almost directly in front of the shed, but Hinojosa left to purchase beer before Olivo arrived. These actions simply cannot be reconciled with Hinojosa's claimed belief that the transaction was going to occur elsewhere and not in or around the vicinity of the shed. Even more damaging to Hinojosa's privacy expectation is the fact that Hinojosa left the scene aware that, as stated in his suppression hearing testimony, "[the shed] doesn't have a lock on it." Under these circumstances, Hinojosa cannot show that he took normal precautions to maintain his privacy interest in the interior of the shed.

These same circumstances counsel us to find that Hinojosa did not possess a subjective expectation of privacy that the shed would remain free from governmental intrusion. See United

9

States v. Briones-Garza, 680 F.2d 417, 422-23 n.5 (5th Cir. 1982), cert. denied, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 181 (1982) ("Absent . . . an admission [on the part of the defendant that he did not expect a particular area to be free from governmental intrusion], . . . the surer course . . . [is] to focus on whether a defendant took normal precautions to maintain his privacy. This would accord with the emphasis the Court has put on an objective standard by referring to a defendant's reasonable expectation of privacy."). On this point, we note also that the record contains an affidavit signed by Cardoza in which Cardoza states that "[Hinojosa agreed] to do the deal at his shop in La Feria[, Texas]."[7] Although Hinojosa testified that he did not so acquiesce and that he gave no one permission to enter the shed, we find Cardoza's account to be more credible, particularly in light of the fact that (1) Hinojosa organized the transaction and directed that the parties meet near the shed, (2) the shed was unlocked and Cardoza knew this to be the case—as is evident from Cardoza's directing Olivo to the shed after Hinojosa had departed to purchase beer; and (3) Hinojosa expressed no concern upon his return from purchasing beer that Olivo was emerging from the shed. While Hinojosa no doubt intended the planned activities within the shed to remain private, the Supreme Court has explicitly stated that the "subjective expectation of not being discovered" conducting criminal activities is insufficient to create a legitimate expectation of privacy. Rakas v. Illinois, 439 U.S. 128, 143-44 n.12, 99 S.Ct. 421, 430-31 n.12, 58 L.Ed.2d 176 (1969).

As for Hinojosa's alleged right to exclude others from the shed, the only evidence Hinojosa presented in support of this "right" was his own self-serving testimony to that effect. Hinojosa's concession that the shed was never locked, however, severely undercuts any general right to exclude which he alleges. Moreover, we note that in arguing in favor of a reasonable expectation of privacy, Hinojosa relies heavily on the Supreme Court's decision in Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), in which the Court found that a union officer had a reasonable expectation of privacy in an office shared with his colleagues. In particular, the Court noted that

---

[7]The government introduced this affidavit as part of its First Sentencing Statement to the court below.

although several other persons shared the office, the officer "still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission . . . ." Id. at 369, 88 S.Ct. at 2124. Implicit in Hinojosa's Mancusi-based argument is a representation that others, most likely Cardoza, had shared access to the interior of the shed—a representation which severely undermines Hinojosa's claim at the suppression hearing that he had "the right to tell [people, including Cardoza,] not to go in there." This inconsistency, in combination with the fact that the shed's door was never locked, suffice to show that Hinojosa has not satisfied his burden of proving that he had a general right to exclude others from the shed.

Finally, we find that because Hinojosa was not on the shed's premises at the time of Plata's search, the final Ibarra factor also cuts against a finding of reasonable expectation of privacy. Having already found that three of the other four Ibarra factors cut the same way, we conclude that Plata's warrantless search of the shed did not infringe upon any Fourth Amendment privacy rights which Hinojosa could legitimately have expected inside the shed's premises. Hinojosa thus lacks standing to challenge the search under the Fourth Amendment.[8]

### III.

Based on the foregoing reasons, we AFFIRM Hinojosa's conviction for possession of cocaine with intent to distribute.

---

[8]In light of this holding, we need not consider whether the district court erred in finding (1) Plata's search to be justified by exigent circumstances, but see supra note 4, and (2) the cocaine to be otherwise admissible under the good faith exception to the exclusionary rule.