# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———

No. 05-51758

———

UNITED STATES OF AMERICA

Plaintiff - Appellee,

v.

MICHAEL F. CUGNO; STEPHEN W. SCHUKO; LAURENTINO J.
LAUREANO

Defendants - Appellants.

———

Appeals from the United States District Court
for the Western District of Texas
(04-CR-1911)

———

United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 13, 2007**

Charles R. Fulbruge III
Clerk

Before JOLLY, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:[*]

This case arises out of a controlled delivery of marijuana. Appellants Michael F. Cugno ("Cugno"), Stephen W. Schuko ("Schuko") and Laurentino J. Laureano ("Laureano") were charged with conspiracy to possess and possession of a controlled substance with intent to distribute. They were tried by jury and found guilty. On appeal, they raise various claims of procedural error.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

On January 28, 2004, Drug Enforcement Agency ("DEA") Special Agent Daktor Holguin ("Holguin"), posing undercover as a tractor trailer driver, had several telephone conversations with Alejandro Garcia-Lozada ("Garcia-Lozado"), in which Holguin agreed to pick up twenty acetylene tanks filled with marijuana and transport them to New York. The next day, at Garcia-Lozada's direction, Holguin met Cesar Trevizo ("Trevizo") at a convenience store and accompanied him to a warehouse. At the warehouse, Holguin met Omar and Cesar Calvillo (the "Calvillo brothers"), who helped Holguin load the twenty tanks into his tractor trailer. The tanks were between four and five feet tall and black, and they resembled large oxygen tanks. Holguin transported the tanks to the DEA's El Paso field division office.

At the field office, Holguin and three other DEA agents unloaded the tanks. Because the tanks were to be flown to New York City, the agents began their inspection by turning the valve on each of the tanks to determine whether they were pressurized. As the valves were opened, Holguin noticed that some of the tanks smelled like marijuana. The agents used a blowtorch to cut open the bottom of one of the tanks, in which they discovered packages wrapped in black garbage bags in a manner consistent with drug packaging methods. The packages contained a green, leafy substance, which was discovered to be marijuana. The agents then resealed the tank.

On August 3, 2004, Holguin accompanied the tanks on a flight to Teterboro, New Jersey, where he turned them over to DEA Agent Peter Feehan ("Feehan"). Holguin watched Feehan take the tanks to the vault in the DEA's New York City field office. Holguin then contacted Garcia-Lozado, who instructed him to bring the tanks to Boston, Massachusetts. Holguin refused, but told Garcia-Lozado that he could have another driver, undercover DEA agent Todd Shea ("Shea"), make the delivery. Garcia-Lozado agreed. Holguin watched

2

the tanks as they were removed from the vault in the DEA field office and loaded onto a box truck, a U-Haul rental, which was transferred to Shea's possession.

Shea made contact with Trooper Sean Murray ("Murray"), a Massachusetts state police officer assigned to the DEA Task Force. Shea reported that he was in possession of twenty acetylene tanks, containing approximately 800 pounds of marijuana, and had received instructions regarding the delivery in a phone conversation with a subject known to him as "Star" or "Estrellita."

On August 6, 2004, Shea traveled from New York City to Murray's office in Boston, Massachusetts where he turned over custody of the U-Haul truck to Murray. After Murray inspected the truck and confirmed its contents, Shea placed a padlock on the U-Haul's door and gave the keys to the U-Haul and the keys to the truck to Murray. Murray then took the U-Haul truck to a DEA storage facility, backed the truck into a warehouse so that its rear door was against a concrete wall, and removed the truck's distributor cap.

On August 9, 2004, Murray returned to the U-Haul truck together with DEA agents who installed equipment which could immobilize the truck, and a surveillance camera.[1] After confirming that the twenty tanks were still in the truck, Murray reinstalled the distributor cap and drove the U-Haul to the Minuteman Tire Shop ("Minuteman") on Route 1, in Wrenthem, Massachusetts. When Shea arrived at the Minuteman, Murray gave Shea the keys to the U-Haul and its padlock. Shea left the U-Haul at the Minuteman and Trooper Frank Glasheen, another member of the DEA Task Force, was assigned to keep an eye on the U-Haul truck. He remained with the truck until instructed to leave the area as the suspects and the undercover officers were approaching.

---

[1] The camera ultimately malfunctioned and no surveillance footage was received.

According to the final delivery instructions Shea received from Star, Shea was to wait at the Citgo gas station until a green Range Rover drove by and flashed its lights and then Shea was to follow the Range Rover. The DEA set up several vehicles and arranged for aircraft surveillance of the area of the gas station. Murray was located in a parking lot directly across from the gas station.

Shea called Star to tell him that he had arrived at the Citgo and was driving a Lincoln Towncar. At approximately the same time, Murray observed a green Range Rover and a red Grand Prix park next to each other in the same parking lot in which Murray was located. Murray saw a person exit one of the two cars and stand between them for a few minutes before getting back into one of the vehicles. The Grand Prix then left the parking lot headed south and the Range Rover exited and headed north into another parking lot.

When the Range Rover passed the Citgo, Shea instructed his driver to head north on Route 1, towards the Minuteman where the U-Haul was parked. The Range Rover did not follow. Shea continued to drive north on Route 1 until he received a call from Star. Shea and Star arranged to meet at the End Zone Bar and Star told Shea that he would be in a red Grand Prix or Grand Am. Shea reached the End Zone and parked. The red Grand Prix pulled up next to him and parked. The driver of the Grand Prix was Star and the passenger was later identified as Appellant Stephen Schuko. Star told Shea that he wanted Shea to drive the U-Haul truck to the warehouse, but Shea refused. Ultimately it was determined that Shea would not have to make the delivery.

Shea also insisted that he receive payment for the delivery before showing Star where the truck was parked. Star and Schuko left and were observed heading north to a McDonald's where they met up with the Range Rover. A short time later, Star returned alone in the Grand Prix with a bag containing $35,250. Shea left the parking lot, followed by Star in the Grand Prix, and drove to the Minuteman where Shea gave Star the keys to the U-Haul and padlock.

4

Star then left the parking lot and drove back to the McDonald's parking lot where the Range Rover was still parked.

Shortly thereafter, the Grand Prix returned to the Minuteman. One of the occupants exited the Grand Prix and entered the U-Haul. Both vehicles then drove north on Route 1. Approximately two hours had passed since Shea brought the U-Haul to the Minuteman and the truck had been under constant surveillance during this time.

The Range Rover joined the Grand Prix and the U-Haul and all three vehicles proceeded together to Stoughton, Massachusetts, with officers trailing them. At some point, the Range Rover and the Grand Prix turned off onto a side street, while the U-Haul continued to an industrial complex with numerous warehouse buildings with loading docks. Around 12:15 a.m., the U-Haul arrived at 300 Tosca Drive, a building which has offices in the front, with a warehouse and three loading dock doors in the rear. The store front belongs to Cyborg, and Jack Grieco sublets the building's rear portion. There is a partition with alarmed doors that separates the two parts of the building.

When the U-Haul and the tailing officers arrived at the industrial complex, it was dark and there was no traffic. Trooper Murray and the other surveillance cars therefore decided not to continue to follow the U-Haul so as to avoid alerting the suspects. Murray took up a surveillance just inside the complex to see if any other vehicles entered. About five minutes after he arrived, the Range Rover and the Grand Prix entered the area and proceeded toward 300 Tosca Drive.

A few minutes after the other vehicles arrived, Murray was told by the air surveillance and other surveillance officers that people appeared to be moving from the back of the U-Haul into the warehouse. At that point, Murray decided to approach the people at the warehouse. He had his driver bring their minivan to the rear of the building where the U-Haul, Grand Prix, and Range Rover were

parked. Another box truck, a Budget truck, was parked against one of the other bay doors. As Murray exited his vehicle, he saw Appellant Cugno and another man standing in the parking lot and two other men in the warehouse, who took off running. Murray contacted additional officers via radio and requested that they come to 300 Tosca Drive.

Murray entered the building at a run, announcing himself as a police officer and carrying his badge. Upon entering the warehouse, Murray noticed that an alarm had begun to sound. He went over to a set of stairs near where he had seen a man running and again announced himself. He climbed the stairs which led to a loft and found a man named Tapia lying against the wall. The two officers who had accompanied Murray to 300 Tosca Drive also entered the warehouse. They pursued Appellant Schuko, who was found hiding in a kitchen-area in the Cyborg offices.

Murray contacted a canine handler, Trooper Bazzinotti, who brought his dog to conduct a search of the warehouse. The dog located Appellant Laureano, who was hiding behind some equipment in the loft.

The five men were brought into the parking lot and questioned separately. Vasquez said he was at the location to meet a friend and have a few beers. Schuko requested an attorney and declined to speak to the officers. Cugno also refused to speak to the officers. Tapia claimed he had come to the warehouse with Vasquez to meet a friend. Laureano stated that a friend of his sublet the back portion of the warehouse, that he sometimes worked for the friend, and that the friend had given him the keys to the warehouse. He said that he was there to help a friend unload tanks from a truck.[2] The officers found the keys to the U-Haul truck and padlock in Appellant Cugno's pocket and large amounts of cash on all of the men. Trooper Bazzinotti and his canine also inspected the

---

[2] These statements were subsequently suppressed.

tanks in the U-Haul truck to which the dog alerted. Shea approached each of the five men to tell them that the dog had alerted and to ask whether the truck or the tanks belonged to any of them. None of the men claimed ownership. All of the men were arrested and the vehicles in which they arrived were searched.

The tanks were transported to the state police barracks at Logan Airport, then to the DEA bulk evidence storage facility, where they were opened and found to contain 1,500 pounds of marijuana.

II.

On December 8, 2005, the Grand Jury returned a superseding six-count indictment naming Appellants Cugno, Laureano, and Schuko, along with other defendants. The appellants were charged in counts three and six. Count three charged them with attempting and conspiring to possess a controlled substance with the intent to distribute in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(vii). Count six charged them with possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(b)(1)(B)(vii).

The appellants filed a motion to suppress and a hearing was held. The district court granted the motion in part, suppressing the statements made by the defendants. The court then issued a lengthy order denying the motion as it pertained to the warrantless searches and seizures of their persons, the tanks, the motor vehicles, and the warehouse located at 300 Tosca Drive. The court first concluded that the defendants lacked standing to raise a Fourth Amendment challenge to Agent Holguin's decision to open one of the tanks prior to the delivery because none of them had a reasonable expectation of privacy in the contents of the tanks. The district court reasoned that because none of the defendants claimed a possessory interest in the tanks, and because the unidentified owner of the tanks abdicated control of the contents of the tanks by giving them to the Calvillo brothers, none of the defendants could establish that

he possessed an actual, subjective expectation of privacy with respect to the tanks.

Having determined that the initial search of one of the tanks was valid, the district court then examined whether the defendants could assert any privacy rights in the tanks after the controlled delivery was completed. The court determined that because the tanks remained under surveillance from the time they were opened until the time they were recovered from the U-Haul truck, and because there was almost no possibility that the contents of the container had changed, the government was in constructive possession of the tanks from the time that they were delivered to Agent Holguin until their recovery from the U-Haul truck. Therefore, the district court concluded that the retaking of the tanks from the U-Haul truck did not constitute a search or seizure.

The court then considered whether the warrantless search of 300 Tosca Drive violated any of the defendants' Fourth Amendment rights.[3] The court reasoned that because Trooper Murray had probable cause to support the arrest of the participants in the drug delivery, and evidence to support his belief that some of the participants were in the warehouse, he was justified in entering the warehouse to pursue them. The court also found that entry into the warehouse was supported by exigent circumstances because the agents had no idea how many people were inside or whether they might be armed.

Finally, the court examined the warrantless arrests of the defendants and the subsequent searches of their persons and vehicles. The court concluded that events leading up to the arrest gave the officers probable cause to effect a warrantless arrest, and that the search of their persons was supportable as incident to the arrests. The court also determined that the officers had sufficient

---

[3] The court did not address whether the defendants had standing to challenge this search because the government conceded that Laureano possessed standing with respect to the warehouse.

8

probable cause to believe that the vehicles they searched were being used to commit a drug offense, and therefore were not required to seek a warrant.

The case proceeded to trial and the jury found each of the appellants guilty of both charges. On November 11, 2005, the district court sentenced Cugno to 66 months of imprisonment on counts three and six, to run concurrently; four years of supervised release on counts three and six, to run concurrently; a fine of $2,500; and a special assessment of $200. Schuko received the mandatory minimum 120 months of imprisonment on each count, to be served concurrently; eight-year terms of supervised release on each count, to be served concurrently; and a $200 special assessment. Laureano received 66 months of imprisonment on each count, to be served concurrently; four-year terms of supervised release on each count, to be served concurrently; and a $200 special assessment. The appellants timely appealed.

On appeal, Appellant Cugno argues only that the district court reversibly erred in permitting the prosecution to make a rebuttal argument against Cugno after failing to "make any real argument" against him in the initial closing. Appellant Schuko argues the district court erred in denying the motion to suppress the physical evidence obtained as a result of the warrantless search and that the district court improperly sentenced him to a ten-year mandatory minimum sentence.[4] Appellant Laureano also challenges the district court's denial of the motion to suppress, and contends that the evidence presented by the government was insufficient to support his conviction. He further argues that the district court erred in permitting the introduction of hearsay testimony. This court has jurisdiction under 28 U.S.C. § 1291.

---

[4] In his reply brief, Schuko "adopts" Cugno's argument that the district court improperly allowed the prosecution to split its closing argument. Claims not raised in an appellant's opening brief are deemed abandoned. Williams v. Ballard, 466 F.3d 330, 335 (5th Cir. 2006).

### III.

### A.

Appellant Cugno argues that the district court erred by allowing the government to give rebuttal arguments as to Cugno after making only generalized references to him in its initial closing argument. The district court's trial management decisions are reviewed for abuse of discretion. United States v. Gonzales, 436 F.3d 560, 582 (5th Cir. 2006).

At the conclusion of the trial, the court asked the government how it planned to divide its closing argument. The government indicated that it planned to reserve twenty minutes (or two-thirds of its total time) for rebuttal. The defendants objected to this division, citing Rule 29.1 of the Federal Rules of Criminal Procedure,[5] and claiming that they had the right to know the arguments that the prosecution would make in favor of conviction before deciding what to argue themselves. The district court overruled this objection. After the initial closing argument, in which counsel for the government mentioned Cugno's name only once, to allege that he was part of the conspiracy, Cugno's counsel asked the trial court to deem any rebuttal argument as to Cugno waived. This objection was also overruled. Cugno did not request time for surrebuttal.

On appeal, Cugno argues that permitting the government to offer rebuttal argument against him after making only general references to him in its initial closing argument eviscerates the core value of Rule 29.1, which is to ensure that the "defendant knows the arguments actually made by the prosecution [on] behalf

---

[5] Rule 29.1 provides that:

> Closing arguments proceed in the following order:
> (a) the government argues;
> (b) the defense argues; and
> (c) the government rebuts.

Fed.R.Crim.P 29.1.

of conviction before the defendant is faced with the decision whether to reply and what to reply." Gonzales, 436 F.3d at 582 (quoting the Advisory Committee note to Fed.R.Crim.P. 29.1). We agree with Cugno that absent special circumstances, allowing the government to save its core arguments for rebuttal may constitute an abuse of discretion; ideally, rebuttal argument should be limited to rebuttal subject matter. After careful review of the record, however, we are convinced that Cugno can demonstrate no prejudice as a result of the government's argument. In its rebuttal, the government referenced only those pieces of evidence against Cugno that Cugno's counsel had himself raised during his closing in order to rebut Cugno's argument that they failed to demonstrate guilt. Cugno has been unable to point to any significant argument that he would have made differently, had the government made more direct reference to him in the first part of its closing. Finally, Cugno failed to request surrebuttal to correct any alleged error. We therefore find no reversible error in the district court's decisions concerning closing argument as to Cugno.

B.

Appellant Schuko contends that the district court erred in sentencing him to the ten-year mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(B)(vii) because the prior conviction used to enhance the sentence was not alleged in the indictment in accordance with Apprendi v. New Jersey, 530 U.S. 466 (2000). Schuko concedes that this argument is foreclosed by United States v. Almendarez-Torres, 523 U.S. 224 (1998), but preserves it for future review.

C.

1.

Appellant Laureano argues that the evidence introduced against him was insufficient to support his conviction for attempting to and conspiring to possess, and possession of a controlled substance with intent to distribute. Both at the

conclusion of the government's case and after both sides had rested, Laureano filed motions for judgment of acquittal. After the guilty verdict was returned, Laureano filed a motion for acquittal notwithstanding the verdict. Laureano's challenge to the sufficiency of the evidence is properly preserved.

In reviewing a sufficiency challenge, this court considers "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). See also United States v. Ivey, 949 F.2d 759, 766 (5th Cir. 1991). In reviewing for sufficiency, this court considers whether the record evidence, including allegedly inadmissible evidence, discloses sufficient evidence of guilt. United States v. Marshall, 762 F.2d 419, 423 (5th Cir. 1985).

To establish a conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that: (1) an agreement existed between the defendants and one or more persons to violate the applicable narcotics laws; (2) the defendant knew of the conspiracy and intended to join it; and (3) the defendant participated voluntarily in the conspiracy. United States v. Medina, 161 F.3d 867, 872 (5th Cir. 1998), cert. denied, Medina v. United States, 526 U.S. 1043 (1999). The government is not required to prove that a defendant knew all of the details of an unlawful enterprise, only that he was aware of an unlawful agreement and was somehow associated with the plan. United States v. Fernandez-Roque, 703 F.2d 808, 814-15 (5th Cir. 1983). Each element of the conspiracy may be established from circumstantial evidence, United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988); however, "the government cannot prove a conspiracy by presenting evidence that only places the defendant in a climate of activity that reeks of something foul." United States v. Jackson, 700 F.2d 181, 185 (5th Cir.), cert. denied, Hicks v. United States, 464 U.S. 842 (1983) (internal quotation marks and citation omitted).

In this case, the government showed that early in the delivery negotiations, Star and another of his associates told the undercover officers that the buyers had a warehouse and people available to unload the tanks. Testimony elicited from Trooper Murray indicated that Laureano was the only person of those arrested during the bust who had access to the warehouse. The warehouse was located in a remote area and the delivery was made to the warehouse after midnight when there was no other activity in the area. Laureano was found in the warehouse at the time of the bust, hiding behind a rolled-up rug.

This court has held that knowledge of the existence of drugs may be inferred from control over the location in which they are located. United States v. Moreno, 185 F.3d 465, 471 (5th Cir. 1999), cert. denied, Moreno v. United States, 528 U.S. 1095 (2000). Based on the evidence given about Laureano's exclusive access to the warehouse, the jury reasonably could have concluded that Laureano made the warehouse available to receive this delivery, and therefore participated in organizing the conspiracy. The jury also could have interpreted Laureano's presence at the warehouse and his decision to remain hidden when the police raided as evidence of his guilt. We conclude therefore, that the evidence presented at trial was sufficient to support the jury's conclusion that Laureano had knowledge of the conspiracy and was associated with its execution.

2.

Appellant Laureano next argues that the district court erred in permitting Trooper Murray to testify about a conversation he had with Mr. Grieco, the owner of the Cyborg company located at the warehouse. Murray testified that Grieco had told him that Laureano was the only person arrested that evening who had the right to be at the warehouse. Murray also said that Grieco told him that Laureano was a friend and employee of the transportation company.

Laureano's counsel objected to this testimony as inadmissible hearsay. The district court overruled this objection on the grounds that co-defendant Schuko

had "opened the door" by asking Murray whether Grieco had explained that the alarm that had been triggered was protecting the kitchen area of Cyborg on the first floor of the building. On appeal, Laureano contends that the district court misapplied the open-door theory by allowing hearsay testimony on an entirely different subject than the one on which Murray was questioned by the defense. Because Laureano objected to Murray's testimony as impermissible hearsay, we review for abuse of discretion. United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996).

It appears that the district court abused its discretion in applying the open-door theory to permit hearsay evidence by Trooper Murray on a topic other than the one introduced by Schuko's attorney in his cross-examination. "Cross-examination with respect to part of a transaction enables the opposing party to elicit evidence on re-direct examination of the whole transaction at least to the extent that it relates to the same subject." United States v. Walker, 613 F.2d 1349, 1353 (5th Cir.), cert. denied, Walker v. United States, 446 U.S. 944 (1980) (citing United States v. Barrentine, 591 F.2d 1069, 1081-2 (5th Cir. 1979)). "Even if the government's re-direct [goes] beyond the testimony elicited by the appellants ... such re-direct [is] still admissible .... [if] limited to the subject matter of the cross-examination." Id. at 1353 n. 5 (emphasis added). Here the testimony elicited by the government as to Laureano's relationship to the warehouse was not related to the testimony elicited by Schuko's counsel as to the set up of the alarm system in the building. Furthermore, we have found no case law indicating that one defendant's counsel may open the door for the introduction of evidence against another defendant. We therefore conclude that the district court erred in permitting Murray's hearsay testimony.

Any error in admitting evidence is subject to harmless error review. United States v. Williams, 957 F.2d 1238, 1242 (5th Cir. 1992). Under the harmless error analysis, reversal is not required "[u]nless there is a reasonable probability

that the improperly admitted evidence contributed to the conviction ...." Id. (quoting Schneble v. Florida, 405 U.S. 427, 430 (1972)). In this case, there is more than a reasonable probability that the improperly admitted evidence contributed to Laureano's conviction. Murray's hearsay testimony was the only evidence directly linking Laureano to the conspiracy other than that he was found hidden in the warehouse during the bust.[6] The government emphasized both in its initial closing and on rebuttal that Laureano was a friend and employee of the owner of the warehouse, and the only person present at the time of the bust who was authorized to be in the warehouse. As the government itself conceded at oral argument, this is not a case in which "the properly admitted evidence of guilt is ... overwhelming." Schneble, 405 U.S. at 430.[7] We therefore

---

[6] The statements Laureano made to the police regarding his relationship to the owner of the warehouse were suppressed before trial.

[7] At oral argument, the government argued that because Murray testified that he thought he saw two people in both the Range Rover and the Grand Prix, the cars that followed the U-Haul to the warehouse, and because five people were ultimately arrested in the warehouse, the admission of the hearsay evidence was harmless. Although not entirely clear from the briefing, the government's argument is that the jury must have believed that Laureano was the passenger in either the Range Rover or the Grand Prix. This argument is unpersuasive, because the government did not introduce testimony that would allow a jury to conclude beyond a reasonable doubt that Laureano must have been the passenger; nor did it argue that theory to the jury.

Murray testified that he thought he saw two passengers in each vehicle while he was in a parking lot waiting to observe the anticipated drug deal between Shea and the buyers. Those two vehicles subsequently left the parking lot heading in opposite directions, at which point Murray testified that he lost sight of the Range Rover. The government does not argue that it maintained constant surveillance on both the Grand Prix and the Range Rover from the time Murray testified that they each had two passengers until the time of the bust, several hours later, nor did it offer testimony indicating that both cars still had two passengers at the time they entered the warehouse.

Furthermore, the government did not argue this theory to the jury. In closing, counsel for the government argued to the jury that the fact that Cugno was in the Range Rover and Schuko and Vasquez were in the Grand Prix was evidence of their involvement in the conspiracy. He made no mention whatsoever of Laureano's presumed presence in the vehicle, but instead relied heavily on Laureano's connection to the warehouse to tie him to the conspiracy. We therefore cannot conclude that the verdict was not affected by the

conclude that the erroneous admission of the hearsay testimony was not harmless. We reverse Laureano's conviction and remand his case for a new trial.[8]

D.

Appellants Laureano and Schuko argue that the district court erred in denying their motion to suppress. After an evidentiary hearing, the district court found that no unreasonable search or seizure occurred during (1) Agent Holguin's search of the sealed cannister; (2) the re-taking of the tanks from the U-Haul truck; (3) the search of the warehouse; (4) the arrest of the occupants of the warehouse; and (5) the search of the vehicles. In considering the denial of a motion to suppress, we review the district court's findings of facts for clear error and its legal conclusions de novo. United States v. Lopez-Moreno, 420 F.3d 420, 429 (5th Cir. 2005), cert. denied, Lopez-Moreno v. United States, 126 S.Ct. 1449 (2006).

The appellants' briefs do not address each of these Fourth Amendment "moments" individually, nor do they clarify which evidence they seek to suppress. Schuko makes no argument at all with respect to the suppression motion, but rather adopts the arguments made in Laureano's brief.[9] Laureano's only specific

---

impermissible hearsay testimony.

[8] Laureano's remedy will be a new trial, not a judgment of acquittal, because the evidence presented at trial, including the improperly admitted evidence, was sufficient to support the conviction. "This court has held that the Double Jeopardy Clause does not prohibit retrial of a defendant following reversal of his conviction for error in the admission of evidence even if the evidence, sans the inadmissible evidence was insufficient to sustain the defendant's conviction." Magouirk v. Warden, Winn Correctional Ctr., 237 F.3d 549, 556 n. 3 (5th Cir. 2001). This is because "we cannot know what evidence might have been offered if the evidence improperly admitted had been originally excluded by the trial judge." United States v. Sarmiento-Perez, 667 F.2d 1239, 1240 (5th Cir.), cert. denied, 459 U.S. 834 (1982).

[9] The government argues that Schuko may not raise fact-specific challenges to his own conviction or sentence by referring to similar challenges in Laureano's brief. United States v. Moser, 123 F.3d 813, 819 n. 3 (5th Cir. 1997); United States v. Alix, 86 F.3d 429, 434 n. 2 (5th Cir. 1996). We need not determine whether Schuko's Fourth Amendment challenge is too fact-specific to be adopted by reference because we determine that Laureano's arguments are meritless.

challenge is to the district court's finding that the entry into the warehouse was justified by exigent circumstances.[10] He argues that the exigent circumstances here were manufactured because the officers could have requested a warrant for the seizures and arrests they anticipated would occur at the conclusion of the surveillance and undercover operation. He further maintains that the officers could have sought a warrant while keeping the warehouse under surveillance. Laureano does not, however, contest the district court's holding that the officers had probable cause to arrest the people who were participating in unloading the U-Haul truck. Because this arrest began in a public place, the police were justified in pursuing the suspects into the warehouse to complete it. See United States v. Santana, 427 U.S. 38, 43 (1976) ("[A] suspect may not defeat an arrest which has been set in motion in a public place ... by the expedient of escaping to a private place."). See also, Fontenot v. Cormier, 56 F.3d 669, 674-75 (5th Cir. 1995). Once in the warehouse, the officers were justified in seizing the tanks which were in plain view, and which they knew to be evidence of drug-trafficking. See United States v. Cardoza-Hinojosa, 140 F.3d 610, 615 (5th Cir. 1998).

---

[10] It is unclear whether Laureano intends to challenge Holguin's initial search of the tanks, the seizure of the tanks from the U-Haul, his warrantless arrest, or the search of the vehicles. "Failure adequately to brief an issue on appeal constitutes waiver of that argument." Robinson v. Guarantee Trust Life Ins. Co., 389 F.3d 475, 481 n. 3 (5th Cir. 2004). Even if, however, we were to excuse Laureano's inadequate briefing, he would lack standing to challenge any search or seizure of the tanks or the vehicles because he claims no privacy interest in any of them. United States v. Pierce, 959 F.2d 1297, 1303 (5th Cir. 1992) ("A defendant bears the burden of establishing ... that he has a privacy or property interest in the premises searched or the items seized which is sufficient to justify a reasonable expectation of privacy therein.") (internal quotation marks and citation omitted). Laureano also offers no specific argument challenging his warrantless arrest and search, nor any discussion of how his defense was prejudiced by his allegedly unlawful detention; however, his arrest was clearly supported by probable cause. United States v. Shugart, 117 F.3d 838, 846 (5th Cir.), cert. denied, 522 U.S. 976 (1997).

Schuko is bound by our analysis as to Laureano because he failed to offer any independent argument as to how his Fourth Amendment rights were violated.

IV.

For the foregoing reasons, the conviction and sentence of Appellant Schuko is AFFIRMED, the conviction of Appellant Cugno is AFFIRMED, and the conviction of Appellant Laureano is REVERSED and his case is REMANDED to the district court for a new trial.

EDITH BROWN CLEMENT, Circuit Judge, concurring in the judgment:

While I concur in the judgment, I write separately because the substantial evidence properly admitted against Laureano makes the harmless error analysis of the improperly admitted hearsay evidence a close issue. Trooper Murray saw four men as he approached the building—two outside who did not run and two inside who began to run. Considering the limited ability of the officer to see through the bay doors into the warehouse while running towards it, it is reasonable to conclude that the fifth man arrested was out of Murray's view but associated with the enterprise of the other four. Laureano's activities after the officers entered the warehouse demonstrated his guilt as well. Murray proceeded to announce himself as a police officer as he entered the warehouse and arrested a suspect at the top of the stairs to the loft—just a short distance away from where Laureano was later found hiding. After announcing, "State Police, canine. Come out now, or we're going to send in a dog," Trooper Bazzinotti conducted a dog search of the warehouse. He found Laureano in the loft, lying behind a rolled-up rug, but Laureano twice refused to raise his hands when ordered. It was only after Trooper Murray returned to the loft that Laureano raised his hands, acknowledging that he had been found. Furthermore, the diagram of the warehouse shown to the jury indicates that the stairway to the loft was one of only two escape routes from the immediate vicinity of the acetylene containers containing marijuana as officers converged on the exterior doors. All of the five suspects arrested, including Laureano, had large amounts of cash on them.

Such determined evasion of the police, possession of large amounts of cash, and proximity to the location of marijuana-laden tanks in the process of being moved, would be overwhelming evidence of guilt—except that the Assistant United States Attorney conceded otherwise at oral argument. Because of the

government's confusion over the facts of its own case, I must concur in the majority's judgment.